Next case is Neighborhood Housing Development Corporation v. The Illinois Department of Revenue. That's case number 4-100052. For the appellant, Meredith Pitts. For the appellee, Timothy McPike. Ms. Pitts. May it please the court, counsel. This appeal is from the decision of the administrative law judge whose recommendation for disposition was accepted by the Illinois Department of Revenue to deny NHDC's applications for tax exempt status. As noted in the briefs, NHDC submitted two applications for non-homestead property tax exemptions for the property we've referred to in the briefs as the townhomes and the Linwood. NHDC utilizes the townhomes to provide low cost housing to low or very low income individuals as those terms are defined by the Department of Housing and Urban Development. NHDC utilizes the Linwood to provide housing to chronically homeless individuals who also have disabling conditions such as AIDS. The administrative law judge determined that these properties do not qualify for exempt status because the properties are not in exempt ownership and are not in exempt use. The issues are whether the administrative law judge committed clear error in finding the townhomes and the Linwood are not in exempt ownership and whether the administrative law judge committed clear error in finding the townhomes and the Linwood are not in exempt use. What are the sources of your corporation's income? Principally grant funding. Grants that the NHDC received to build these townhomes, other housing projects in Decatur, Illinois. How about the operation? I understand grants to build, but there are operating expenses along with that. Once you open them up, where does that money come from? They receive private donations from banks and other sources in the community. They collect rents for some of their properties like the townhomes. Does the rental cash flow? You've got X number of units. You fill those units based on a sliding scale, tenant per tenant, by tenant, whatever that is. Does the operation of the complex cash flow without outside income? The townhomes and the Linwood are both operating at a loss. So the rents collected are not sufficient to pay all the expenses associated with maintaining the property. The biggest source of why they can't cover those expenses are the real estate taxes, especially for the townhomes. If they were taxed except for real estate taxation purposes, would they cash flow? Yes. Was that evidence presented to the trial judge? Yes. In the transcript, the executive director of NHDC talked about the cash flow and how it was currently running in the negative and why it was running in the negative and how they cover that negative cash flow presently, which is from other sources. As this court knows, in order to qualify for exempt status, the property must be in exempt ownership and in exempt use. The Illinois Supreme Court has established guidelines for determining whether property is in exempt ownership or in exempt use, commonly referred to as the pores and factors. In this case, NHDC provided evidence demonstrating it meets all of the pores and factors, and those are sub-four in the briefs. The Department of Revenue did not challenge the evidence provided by NHDC and did not provide any evidence or arguments to refute the claims made by NHDC. In fact, the Department of Revenue did not even submit a closing argument brief and state that NHDC's application should be denied. Therefore, the Department of Revenue's claim that NHDC did not meet its burden or provide enough evidence to demonstrate one or more of these factors ignores the fact that NHDC provided evidence as to each of the factors and because those factors were not contraverted, did not supply any additional evidence. For example, what we just talked about, the Department of Revenue has argued that limited information was provided concerning NHDC's income. However, NHDC provided its 2006 audited financial statement. In response to questioning from the Department, NHDC testified that the majority of its income came from grants. The Department sought no further information regarding the audited financial statement, and the audited financial statement does not indicate that grant funding was anything other than money received from the government, but it did not reflect that it was contracted for payment for services. There was no testimony or anything about NHDC's operations that suggests it received funding for payment for services. As to the Department's claims that NHDC does not benefit an indefinite number of people, the Administrative Law Judge stated that with respect to the townhomes, a prospective tenant must meet a list of requirements before being eligible to reside there. The ALJ stated in her recommendation that because these requirements must be met, not everyone who needs help will receive it. The requirements also help to ensure that NHDC receives payment and are obstacles in the way of those seeking its benefits. However, this statement ignores the evidence that was provided by NHDC. As NHDC has consistently argued, those requirements were not NHDC's requirements, but those were the requirements of the Illinois Housing Development Authority and were a condition for NHDC to receive the funding to construct the townhomes. The Department of Revenue has argued that this is a distinction without a difference, because it was NHDC who imposed or acquiesced to the imposition of these requirements. However, the distinction is important because NHDC itself does not impose requirements on anyone who utilizes any of its services. In order to comply with the restrictions and to avoid defaulting with respect to the loan it received from IDA, NHDC has to comply with IDA's restrictions and utilize IDA's Tenant Selection Plan. Utilizing IDA's Tenant Selection Plan has not previously been determined by the Department or any Illinois court that I can find to amount to a finding that the organization does not benefit an indefinite number of people or amount to an obstacle that would prevent the organization from achieving tax-exempt status. In fact, other properties that have received IDA funding and utilized IDA's tenancy requirements have achieved tax-exempt status. The YMCA case outlined in NHDC's brief and included in the appendix is one such example. As to the requirement that NHDC dispense its benefits to all people who need to apply for them, the Administrative Law Judge suggested that NHDC evicts people for the non-payment of rent based on language in its tenant leases and as a result, it does not dispense charity. However, the Administrative Law Judge turned a blind eye to all the evidence provided by NHDC in this regard. Mary Walker, the Executive Director of NHDC, testified that this non-eviction policy was in place since before the townhomes were constructed. A formal non-eviction resolution was enacted by the Board of Directors of NHDC in 2006. There was testimony on NHDC's behalf by Lori Baker, Chris Karch, and Polly Canfield, who all testified as to NHDC's non-eviction policy. Mary Walker further testified that no one has ever been evicted from either the townhomes or the Linwood due to the failure to pay rent. As a result, the ALJ's claim that there was insufficient evidence for her to conclude that there is a fee waiver policy in effect or that a tenant has not been evicted for the failure to pay rent ignores the resolution and ignores the testimony of the individuals at the hearing. As to the Linwood, the Administrative Law Judge concluded that NHDC expects payment from some source and made the inference that if a tenant no longer qualified for a subsidy to pay a portion of her rent at the Linwood that they would be evicted for the non-payment of rent. But as I've stated and as I've said in the briefs, NHDC would not evict a tenant for the non-payment of rent at the Linwood. Doesn't the Department argue, though, that there was never an eviction because rent always got paid, although sometimes late? Well, the Administrative Law Judge and the Department have suggested that that is the case, but the fact is that if NHDC has never evicted somebody, they've complied. They have a non-eviction policy and they've complied with that policy. But isn't their written policy different? I mean, I thought they had a written policy or a written directive to the manager that they could evict people for non-payment of rent and that it was an unspoken policy and not published that they wouldn't evict for non-payment. I'm not sure about unspoken. It was communicated to the property manager, Swartz Properties. Swartz Properties was the property manager for both the Tom Holmes and the Linwood. And it was communicated to them that no tenant should be evicted for the non-payment of rent. But it wasn't communicated to the tenants and their leases provided that they could be evicted for non-payment. That's correct. It wasn't a policy that was posted at the property. It wasn't communicated to them. It wasn't communicated to tenants at the time they applied for the loan. Would that be because if you communicated that policy to the tenants, nobody would ever pay rent? Correct. That's what Mary Walker testified to during the hearing process. Was that, you know, if we put a big sign on this that says, well, the purpose of an HTC is to sort of help, well, with respect to the Tom Holmes, is to help people build a good solid history of paying rent and maybe move to the goal of home ownership. Post a big sign at the property and say, you don't really have to pay the rent because we're never going to kick you out, would discourage them from making timely payments. Let me ask you this. Does the ability to evict automatically preclude the exemption? I don't think that the ability to evict precludes the eviction because there's other bases to evict somebody. For example, at the Tom Holmes, you could evict… Does that mean that because that was the scenario that happened under my factual hypothetical, does that preclude an exemption? I think… And obviously that would have to be something that happened before you got to the hearing stage. Right, right. If you have a documented financial inability to pay the rent and the organization still has the ability to evict, I think that would take you out of being tax exempt. In this case, if the tenant had a documented financial inability to pay the rent, then there would be no eviction. And they testified consistently that people got behind and they never… So if they did have the financial ability, they just refused to pay it, then eviction would not affect the exemption? Correct. Okay. Thank you. As to the requirement that NHDC does not place any obstacles in the way of those seeking its benefit, it's somewhat related to the first coercion factor. We've stated that Tom Holmes and the Linwood is open to all who meet IDA and HUD requirements. At the Linwood, tenancy is open to all who meet HUD's definition of chronically homeless. NHDC testified that it is open…tenancy is open on a first-come, first-served basis. As to the requirement that NHDC solely use the property for charitable purposes, the Tom Holmes are used to provide housing to low and very low income individuals. The Linwood is used to provide housing to chronically homeless individuals with disabling conditions. The properties are not leased with a view to a profit. In fact, they don't generate any income for NHDC and currently cost more to maintain and operate than what is collected in rent. Finally, as we pointed out in the briefs, the properties at issue in this case are similar to the properties at issue in the Department of Revenue of the State of Illinois versus the YMCA. Not precedential in terms of binding. It's a recommendation made by the Department of Revenue. But doesn't the department respond to your argument that this case is similar to the Peoria case, that in the Peoria case, YMCA had alternative housing? And I think that cuts against the YMCA's charitable nature. Yeah, I see you argue that in your reply brief, if you'd expand on that. Sure, because, you know, in the YMCA case, they had the ability, if somebody was unable to pay their rent, they could move them to another property. In this case, NHDC is not moving anybody. They're letting them stay there. I mean, as far as the evidence was presented, indefinitely, without requiring them to pay back rent, catch up, or move. So I think in a case where you actually have to move somebody out of their property because they're paying rent is less charitable than allowing them to stay and just simply communicating with them about being behind on their rental payments. As stated, NHDC utilizes the townhomes to provide housing in an effort to help tenants improve their economic situation, learn how to properly take care of property, and perhaps allow them to own property of their own. NHDC utilizes the Linnwood to provide housing to chronically homeless individuals with disabling conditions who have no other place to live. These types of housing programs serve the public interest and lessen the state's burden. The sole use of the townhomes and the Linnwood is charitable, and for these reasons, these two properties should be exempt from real estate taxation. Thank you, Counsel. Mr. McPike. Good morning, Your Honors. Please support Counsel Timothy McPike for Lisa Madigan, Attorney General, representing the Illinois Department of Revenue. This Court should affirm the Department's decision to deny an exemption because the neighborhood housing failed to prove clearly and conclusively that it met the third, fourth, fifth, and sixth Methodist factors which determine the constitutional issue of whether a property is used for charitable purposes. If they did not have the provision in their leases that provided that people could be evicted for non-payment of rent, would that change the whole character of this case? Not entirely, because although they passed a resolution to address Justice Pope's question, they had, in fact, a resolution that they passed that said people were not evicted. But bylaws and resolutions and documents are insufficient evidence. But the lease provided they could be evicted, and that's what really controls it. Yes, and your hypothetical said if they didn't have that in there. My answer would be they could have bylaws and resolutions and all of that, but Provena held, Eaton Retirements held, community health services have held, that documents aren't enough. You have to show actual use. So for this tax year, which I believe is 2006, they would have had to show that there was somebody who had an inability to pay that they kept and did not evict. That seems a little bit circular. You're saying the bylaws and resolutions aren't enough. They're necessary, but not enough. And yet the fact that they have never evicted isn't enough either. Well, because it's not only a non-eviction policy, you have to have a fee waiver or reduction policy. They haven't reduced any fees, and they haven't forgiven any fees. They just delayed the payment of fees. Here's the question I was getting to leading up to this. Ida finances projects like this all over the state of Illinois. I mean, that's why Ida exists, right? And if Ida has in their boilerplate funding agreements that the recipients have to enforce the payment of rent, that would mean by definition that any Ida-funded residential facility would never qualify for real estate tax exemption. Unless, as the department held in the YWCA case, that that particular property was part of a continuum of services provided by the owner of the property, and it was a necessary component of that continuum of services. In fact, contrary to counsel's argument, the YWCA case is the department's position on these issues, which is that this particular function of this property is not, by definition, it cannot be charitable. And the YWCA case, which is in the appendix starting at page 78, I think, does a very good job of going through and basically holding that the YWCA property would not have qualified for these very reasons. The Ida requirements, per se, take it out. It's a necessary component of a continuum of services when you have properties and your whole charitable purpose is to take a person from total inability to pay, like the women's shelters that they had here, or here, if, hypothetically, if neighborhood housing had some facilities where they took people right off the street who could not afford anything, and they provided them with services. They needed a step one. You can't just stop it, or start at step two, is what you're saying. You can't just take the last step, because the last step is, by definition, trying to get these folks to be self-sufficient and to pay. Well, I guess more of a philosophical question doesn't really impact this case, but it just strikes me that you've got kind of a governmental disconnect between Ida and the Department of Revenue in terms of, I mean, they're out there funding all these things for what they, I think, intend is a charitable purpose, but because of their regulations, they don't qualify for charitable purpose. And I just, that's more of a philosophical comment. It is, and it goes to this court's decision in the Provena case. I'm fairly familiar with that. Yeah, I understand. That's why I wanted to raise this, because it went out to the Supreme Court, and the Supreme Court seemed to indicate, as this court recognized, the six factors are, and the Supreme Court said in Provena, that kind of five of those six identified a charitable organization. And then the Supreme Court seemed to suggest that that's only a statutory requirement. So the first five, if you read that case that way, would say the first five Provena, the first five Methodist factors would only be a charitable requirement. But as this court recognized, the Methodist factors, and the Supreme Court has consistently held this, are to determine the constitutional issue of charitable use. And Small Beef Pangle very specifically said that, Small Beef Pangle, Illinois, 60 Illinois 2nd at 515, said, to determine the constitutional issue of charitable use is one which we have held that the use of the property benefits an indefinite number of persons, funds are derived mainly from public and private charity, charity is dispensed to all and without obstacles, and the use is exclusive. That is a constitutional issue. The legislature cannot change that. So in 1565C, the statute at issue here, and I misstated this in our brief, and I have to apologize to the court, we stated that the legislature added the issue of charitable ownership, a requirement under 1565C. The legislature didn't do that. Charitable ownership doesn't appear in 1565C. It's in 1565A, B, and some of the others. But it's not just a statutory requirement. It is a constitutional requirement. And this type of a facility standing by itself cannot meet those constitutional requirements because the whole purpose is to have people who are paying, even if their payment is subsidized, and property is used only for people who can pay. If there is any charity involved, it's the subsidy from here, from the Dove organization, not from the property owner. Here, neighborhood housing does not provide any services. Neighborhood housing uses heritage health. That's third parties to provide services. So it doesn't provide any free services. In the YMCA, the YWCA case, the YWCA was providing free services even to the people in this type of place. So if the appellant here had a non-IDA-financed homeless shelter as a catchment, if you will, for their clientele that they want to move into subsidized housing, that would make the whole program tax-exempt. I would qualify that and say you couldn't just go quickly buy a shelter that could house five people. It has to be, the primary purpose has to be charitable use. And the YWCA said, citing this court's, or the Memorial Child Care, which was this court's decision, and which this court's decision cited McMurray College, the Illinois Supreme Court, said it has to be a necessary component. So even though this particular piece of property is only used for paying people, it has to be a necessary component of a larger charitable organization and charitable purpose, and that has to be the primary purpose. So you would have to have, as the YWCA had, the primary purpose to take people from absolute destitution to self-sufficiency. You probably used the word homeless shelter. Yes. The homeless shelter would have to be the first step, and this would have to be the last step, but the homeless shelter just couldn't be a tag-on just to qualify. If they're only going to shelter five people and then say we're housing 80 here, clearly that's not taking them from the street there. It's the primary there. Counsel, I know the Supreme Court's provenia case, only five judges participated, and it doesn't appear that any four judges agreed upon any single issue. So my question is, based upon that mix between only being five of them in the dissent and the special concurrence, does that do anything to its precedential value? For the most part, the only issue that did not get, I mean there was one justice, one justice especially concurred. The only issue that that justice took issue with was this kind of very arithmetic determination of cost-benefit analysis, how much free care you're providing, and the courts in that concurring justice center don't buy that. But all the other holdings of the majority, aside from that, had enough justices to qualify to be precedential, and they're all soundly based on prior decisions. So there's not a lot of change really as far as the precedential value of that decision. And internally what the Attorney General is doing is citing provenia for those provisions that either have the plurality plus the special concurring agreeing upon, or if it's only the major opinion, then we can cite the prior opinions that have the same precedential value. So the bottom line on provenia is that except for that one technical issue of can you make the mathematical computation of 18 charity care guys isn't enough, aside from that issue, provenia is good law and precedential authority. And certainly in the issues here, for the things that we cited before, it's precedential. The other issues I want to address are neighborhood housings. The main argument seems to be that they don't understand that they have the burden of proof, and the fact that you can present some evidence and the department doesn't rebut your evidence doesn't mean you win. Specifically as to the third issue, whether the funding was mainly from charity, the third Methodist issue, their evidence was a line item in their financial statements, which is on A11 of the separate appendix, the line item grant. Well grant, as the ALJ pointed out in quite a bit of detail, is an ambiguous term. It could mean a charitable contribution, it could mean a fee for service, and they were very careful in their briefs never to say that there was evidence that the grants were in fact charitable donations. It's an ambiguous term. They failed to give any evidence showing the terms of those grants whether they were in fact fee for services. So under the A.R. Barnes case, that ambiguity doesn't qualify as sufficient evidence to be clear and conclusive evidence of a donation. They did have a line item for contributions on that same page, but that was only about $6,000. And even then, a line item is insufficient without underlying detail in evidence to show. The fact that the line item correctly reflects what it purports to reflect, and that's the Three Angels broadcasting case. A mere line item without supporting detail is insufficient evidence to clearly and conclusively show what it's purported to show. In addition, on the whether funds were mainly from charity, whether the grants constituted contributions or donations, they had a brochure listing organizations, and that's on record at page C37, but that just lists the organizations that donated. It doesn't say how much they donated. It actually doesn't say specifically that they were donations. It just said we received funding from these organizations. We don't know from the brochure what form the funding took. So that's not sufficient. The next thing they directed to is Director Mary Walker's testimony explaining about this $237 of restricted assets that became unrestricted. I read that testimony over several times myself. I submit that it is vague and inconclusive because you still cannot tell what strings are attached to this restricted or unrestricted assets, whether they were donations, whether they were fees for services. The testimony is simply inconclusive, and again the Three Angels case says that even expert testimony, in that case it was a CPA, giving conclusory statements like that is insufficient without documentation showing specific details so the court itself can make the determination that this was a donation. There is nothing in this record from which this court can determine that any of those funds were donations as opposed to fees for services. There just is insufficient evidence to know that. And again they cite their articles and their bylaws, which that's true, those articles, it's necessary for those articles and bylaws to be in place stating your charitable purpose, stating that you're going to take donations, but without evidence of actual donations the evidence is not clear and conclusive. And again that's the Provena case and the community health care case. The evidence that they are a 501C3 corporation again is a statutory requirement under 1565C, but as the court in Eden held it's necessary but not that you receive your funds, that you're receiving your funds mainly from charity, nor is the fact that you qualify for a use tax or sales tax exemptions as the housing department, neighborhood housing does here, that is not insufficient either and that's again the Provena case. On the issues of the fourth and fifth Methodist Factors, that charity is provided to all with no obstacles. Articles and bylaws are insufficient without showing of actual use. In Eden, the Supreme Court said late fees and the ability to evict cannot under any circumstances be considered promoting charitable use. So the fact to address your hypothetical and your question is if there is a provision, a limit to the amount of charitable use that can be provided, if there is a legal provision in their bylaws that allows them to evict for inability to pay, that's a requirement, they did pass that resolution, but you actually have to show that you've either reduced somebody's fee or you've allowed them to continue to stay without charging. Here the only evidence is of actual use is that they kept them and then worked out an arrangement where they could pay later. They didn't reduce the fees, they didn't eliminate the rent payment, they just deferred payment. Well, the Eden case specifically says, in that case in reference to entrance fees, the best they could have expected here was a delay in paying the entrance fee. That does not constitute charitable use. Basically charitable use is letting people stay someplace for free or providing them severely, intensely reduced rent that you make up the difference yourself through your charitable funding. Here, although there was a reduced market rate, a reduced rental income as far as the market rate, the funding came from HUD. So under the fourth, fifth, whether it's HUD or HUD, just as Appleton said, the very structure of the IHDA requirements eliminate this type of housing as charitable use housing. Because this section, this part of the process is specifically designed to teach people how to pay rent and requires them to pay rent. It cannot qualify as a matter of the Illinois Constitution unless the Illinois Supreme Court changes it, IHDA. Certainly their contractual agreements cannot supersede the Illinois Supreme Court's determination or interpretation of what constitutional this is. And even the Illinois legislature could not change that. Only the Illinois Supreme Court can change that because they have held this is determining charitable use, the constitutional requirement. If the court has no other questions, then therefore the department respectfully requests that this court affirm their decision. Thank you, Mr. and Ms. Pike. Ms. Pitts, in rebuttal, please. I think NHCC and the department have stated their positions. Actually, I've stated my position a bunch of times, unfortunately. I've been on the losing end of it every time I've stated it. But in response, the department has been consistent in their response. But you do it well. To reply further would just be beating the dead horse, unless the court has any questions. Thank you, counsel. Thank you, counsel. The case is submitted and the court stands in recess until after lunch.